CENTRAL IOWA REFUSE SYSTEMS, INC., Plaintiff,

v.

DES MOINES METROPOLITAN AREA SOLID WASTE AGENCY, et al., Defendants.

Civ. No. 79-32-1.

United States District Court, S.D. Iowa, C.D.

Dec. 10, 1982.

F. Richard Lyford and Barbara G. Barrett, Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, for plaintiff.

Roy Meadows, Whitfield, Musgrave, Selvy, Kelly & Eddy, R. Michael Hayes, City

Sol., Des Moines, Iowa, for city of Des Moines.

James Brick, Des Moines, Iowa, for all other defendants.

## RULING AND ORDER

STUART, Chief Judge.

Plaintiff, Central Iowa Refuse Systems, Inc. (CIRS) brought this action against the Des Moines Metropolitan Area Solid Waste Agency (Metro) and the 15 municipalities and Polk County, which constitute its membership, alleging violations of Sections 1 and 2 of the Sherman Act, The State of Iowa antitrust laws and the Iowa and United States Constitutions. Metro was formed by the defendants under federal and state law to provide a sanitary landfill to dispose of the solid waste generated in Polk County, Des Moines and other municipalities in the Des Moines metropolitan area. All defendants will be referred to collectively as "municipalities" unless individual identification is necessary.

Plaintiff clearly and succinctly identifies particular conduct of which it complains as follows:

CIRS does not challenge the establishment of the Metro facility. It does not dispute the municipalities' powers to regulate the disposal of refuse and garbage, either pursuant to the municipal police power to promote and preserve the welfare and convenience of the people (citation) or pursuant to statutory mandate (citation). It does not challenge the municipalities ability to jointly exercise their powers to provide for joint facilities, including sanitary disposal projects.

What CIRS does challenge here is the defendants' method of insuring the economic success of its project by destroying competition, i.e., requiring that, as long as the bonds are outstanding, all solid waste generated from within the Metro area be deposited at the Metro site, and the enforcement of that anticompetitive activity by way of permits and criminal ordinances. Such conduct obviously cannot be justified as a proper exercise of the Defendants police power since the requirement is not tied to a health or welfare concern but rather to a financial one.

The liability issue has been submitted to the Court upon stipulated fact, written briefs and oral argument. Although several issues have been presented to the Court, it is only necessary to consider the issues of jurisdiction and state action.

## FACTS

Prior to the existence of Metro, Des Moines and the metropolitan area surrounding it located in Polk and Warren Counties had encountered problems with the management of solid waste. Des Moines and other governmental units hired consulting engineers to conduct a study of the collection and disposal of solid waste in the area. The report, made in 1968 (1968 Report), recommended, among other things, the formation of a metropolitan solid waste agency for the collection and disposal of all solid waste produced in the study area to be financed by revenue bonds.

Consequently, Metro was established in July of 1969 under Chapters 28E and 28F of the Code of Iowa. In December 1969 Metro members adopted a document entitled "Amended and Substituted Intergovernmental Agreement Creating the Des Moines Metropolitan Area Solid Waste Agency". Metro entered into the Solid Waste Disposal Service Contract with each of the municipalities.

In 1971 Metro planned and developed a solid waste landfill 10 miles east of Des Moines, and pursuant to Chapter 28F of the Code of Iowa, issued revenue bonds to fund its development. The revenues were to come from charges collected upon entry to the landfill disposal sites and charges to be collected from the municipalities.

The contract payments described in the Solid Waste Disposal Service Contract are municipal obligations as defined in the Intergovernmental Agreement. Under the provisions of Section 401 of the Service Contract and to provide a method by which

its requirements could be met, the municipalities agreed that each one would adopt an ordinance prior to the execution of the Service Contract authorizing the levying and collection of rates, charges, and tolls for the services and facilities of the disposal project.

Such rate ordinances were adopted by each member of the agency. Under the ordinances each member agreed that the charges would be sufficient to provide for the members' proportionate share of (1) operation and maintenance expenses for said disposal facilities, (2) the principal and interest on the Solid Waste Disposal Revenue Bonds, and (3) all reserves, renewal and replacement funds and other funds provided for in the resolution authorizing the issuance of the Bonds.

Each ordinance further provides that such charges, rates, and tolls would be put into effect whenever necessary in order for the member to comply with the provisions of its solid waste disposal service contract. Each ordinance also provides that the member may in its discretion apply such other lawfully available monies it has on hand for such purpose.

The consultants to the agency advised the municipalities that the financial markets at the time required, as a condition to the underwriting and marketing of said bonds, that the following language be included in the Solid Waste Disposal Service Contract entered into between Metro and its members for the protection and security of the bondholders:

Section 105. Disposal. The municipality does hereby agree, that to the full extent permitted by law, all Solid Waste generated from within its jurisdiction shall be disposed of at the Project.

Section 701. Non-Competitive Facilities. So long as any Bonds of the Agency are outstanding, the Municipality shall not grant any franchise or license to any person, firm, association or corporation for a competing solid waste disposal system, nor shall they permit any municipal solid waste disposal system to compete with the Agency. The Municipality may,

without Agency consent, dispose of construction or demolition material, tree removal residue, decrepit automobiles and other nonputrescible solid waste generated out of the Municipality's own activities, in a disposal site apart from an Agency disposal site.

The Agency however shall have the right to establish, construct and acquire any other disposal project, provided, however, that no such other disposal project shall be so established, constructed or acquired pursuant to the terms of the Resolution, and will not materially or adversely affect the revenue to be derived from said Project, or the rights and security of the holders of the Bonds issued pursuant to said Resolution.

The consultants represented to Metro that, without the provisions of Section 105 and 701 of the contract, the revenue bonds would not be marketable because revenues could not be assured. In the event of default of payment under the bonds the member cities become liable for any default.

The Bonds were issued pursuant to a resolution adopted by the Agency. The principal and interest on the bonds issued pursuant to this Bond Resolution are to be paid solely from the net revenues derived by the Agency from the operation of the Project and the gross revenues to be derived from the Project will be first utilized to pay all costs of the operation and maintenance of the Project.

The Resolution, and any subsequent resolution amending or superseding the resolution, is a contract between Metro and the bondholders; and the covenants and terms of the resolution are for the protection and security of the bondholders. The bonds are secured by a lien on and a pledge of the revenues derived from the operation of said project. The restrictions enumerated in the paragraphs above need be in force only as long as the bonds are outstanding.

Some member entities of Metro have passed ordinances making it a crime to take solid waste from the environs of the member entities to any other place other than Metro's facilities. Ordinance No. 9137 of

the City of Des Moines requires persons hauling solid waste to obtain a permit to do so and requires such permittees to haul all solid waste either to Metro's facilities or to a solid waste transfer station licensed by the City of Des Moines, which must then be hauled to the Metro facility.

Norwalk, Polk City, Runnells and Polk County have no ordinances or laws requiring solid waste collected within their boundaries to be disposed of at the Metro Solid Waste Landfill. All of the other members have ordinances which require that all persons hauling solid waste from within their respective City limits obtain a permit to do so and further require that all such permittees must haul all solid waste to Metro's facilities. Because of the ordinances adopted by the municipalities, those persons holding permits to haul solid waste are not allowed to haul refuse from the metropolitan area to the sanitary landfill formerly operated by CIRS in Madison County, which is outside of the metropolitan area.

### JURISDICTION

All of the defendants except the City of Des Moines argue that this court lacks jurisdiction of any federal antitrust claims because CIRS has failed to plead and prove that the municipalities activities are either (1) in interstate commerce, or (2) that it has an effect on interstate commerce.

Although the complaint does not make such allegations specifically, the Court is of the opinion that the allegations of Counts I and II are sufficient to place the defendants on notice that plaintiff is claiming the defendants' activities placed unreasonable restraint on interstate commerce. Said defendants' motion to dismiss the action for lack of jurisdiction for failure to plead the jurisdictional requirement of interstate commerce should be and is denied.

■ To establish jurisdiction the plaintiff must proceed to demonstrate by submission of evidence that the defendants' activities are interstate commerce or if the activities are local in nature that they have a substantial effect on some other appreciable activity in interstate commerce.

*McLain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). The breadth of the Sherman Act corresponds with the broad reach of the Commerce Clause. *Ibid.* p. 241, 100 S.Ct. p. 508.

Defendants' primary reliance is placed on *Heille v. City of St. Paul,* 512 F.Supp. 810 (D.Minn.1981) which was affirmed by the Court of Appeals at 671 F.2d 1134 (8th Cir.1982). In that case the City, by ordinance, entered the solid waste collection business in 1971. The rates established by the ordinance and the subsidies to widows, senior citizens and low income families resulted in losses that were made up by the general revenue taxes. The action, claiming defendant's predatory pricing practices caused plaintiff to lose many customers, was filed in January 1980. The City terminated its solid waste collection business in March of 1980.

The narrow issue before Judge Devitt was "whether the fact that the tools of defendant's trade, as opposed to its product or service moves in interstate commerce is sufficient to meet the 'incommerce' or 'effecting commerce' jurisdictional prerequisite of the Sherman Act.'" *Heille,* 512 F.Supp. at 812. Judge Devitt held that such fact did not provide the necessary interstate nexus. The Eighth Circuit Court of Appeals affirmed under the relevant cases and the whole record. *Heille,* 671 F.2d at 1137.

■ The record before the Court here, in addition to showing extensive purchase of equipment and supplies that had moved in interstate commerce also shows the following:

1. Congress considers the disposal of solid waste a national problem and passed legislation to furnish financial, and technical assistance and leadership to states, regional and local agencies in dealing with problems involving solid waste. 42 U.S.C. § 6901 et seq.; House Report, Resource Conservation and Recovery Act of 1976, P–L 94–580 1976 U.S.Code & Adm.News 6247.

2. The preparation of the 1968 Report which recommends the formation of Metro was funded in major part by HEW Grant No. 1–D01–V1–00060–01 from the U.S. Public Health Service, Department of Health, Education and Welfare.

3. Out of state counsel, consultants, and engineers earning fees of nearly $170,000 were involved in the Metro project.

4. At least $230,000 worth of revenue bonds issued to finance the Metro project were sold to out-of-state dealers.

5. The alleged anti-competitive activities are directly connected with the salability of the revenue bonds.

The Court is of the opinion that the record shows a sufficient basis for satisfying the Acts jurisdictional requirements under the "effect-on-commerce" theory. Defendants are not in a very good position to argue that their activities do not affect interstate commerce when they have relied for assistance and leadership on a federal act that would be unconstitutional if it is not authorized by the Interstate Commerce Clause.

The Court holds that the defendants' motion to dismiss the federal anti-trust claims for lack of jurisdiction should be and it is hereby denied.

## STATE ACTION

■ *Parker v. Brown,* 317 U.S. 341, 350–352, 63 S.Ct. 307, 313–314, 87 L.Ed. 315 (1943) recognized that Congress did not intend for federal antitrust laws to restrain a state or its officers from pursuing anticompetitive activities directed by the legislature. The "state action" exemption has been subject to considerable attention by the Supreme Court in recent years.[1] Here we are concerned with its application to municipalities and other subdivisions of the

State. Governmental subdivisions are not automatically afforded the "state action" exemption. *LaFayette v. Louisiana Power and Light,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed. 364 (1978). However a state may properly direct or authorize its instrumentalities to act in a way which would be inconsistent with antitrust laws, if such action did not reflect the state's policy. *Ibid.* p. 417, 98 S.Ct. p. 1138. The evidence must show that the conduct engaged in as an act of government was pursuant to a state policy to displace competition with regulation or a monopolistic public service, Ibid. p. 413, 98 S.Ct. p. 1136, which has been clearly articulated and affirmatively expressed. Ibid. p. 410, 98 S.Ct. p. 1135 and *Community Communications Co. v. City of Boulder,* 455 U.S. 40, fn. 14, 102 S.Ct. 835, fn. 14, 70 L.Ed.2d 810 (1982). An adequate state mandate for anticompetitive activities exists when it is found from the authority given a governmental entity to operate in a particular way that the legislature contemplated the kind of conduct or activity complained of. *LaFayette,* 435 U.S. at 415, 98 S.Ct. at 1138.

The only aspect of the actions and conduct of these defendants that plaintiff challenge is the requirement that all solid waste generated from the Metro area is to be deposited at the Metro site:

CIRS' claim is based on the illegal means by which the Defendants sought to insure the economic viability of this project: by illegally extending whatever monopoly may have been authorized by the legislature to only monopolize landfill sites within the county, to also monopolize the disposal of all solid waste generated within the county so that no one could compete with the Metro landfill.

Plaintiffs Reply Brief, August 2, 1982.

The issue is whether the state statutes authorizing or directing such conduct meet

1. *Community Communications Company, Inc. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810; *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of LaFayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

the "clearly articulated" and "state supervision" standards so that it can be found that such conduct was within the contemplation of the legislature. There is nothing in the underlying federal legislation 42 U.S.C. § 6901 et seq. which expressly envisions or directs monopolistic practices in solid waste disposal projects. Nor is there anything in the state laws that specifies that public agencies shall have the right to dispose of all solid waste generated within their borders or even that anticompetitive conduct in general is condoned. The Court agrees with the following statement from Antitrust Immunity for "State Action" after LaFayette by Phillip Areida, 95 Harv.L.R. 435, 445–446:

LaFayette does not require that governmental acts be 'compelled' or supervised by the state. Rather, it demands that the legislature have authorized the challenged activity with an intent to displace the anti-trust laws. Unfortunately, state statutes seldom speak with clarity on either matter. In practice, therefore, express statements of authority or intent cannot be required. The Supreme Court has found it sufficient that the legislature contemplated the kind of action complained of. A policy to displace the antitrust laws will then be inferred if the challenged restraint of competition is a necessary and reasonable consequence of engaging in the authorized activity.

■ The Court must therefore look to the authority granted by the state laws. Involved are Chapter 455B, particularly sections 455B.75 through 455B.84, and Chapter 28E and 28F of the Code of Iowa. Under the statutory scheme every city and county in the state was mandated to provide a sanitary disposal facility for final disposal of the solid waste of its residents. The cities and counties were authorized and encouraged to join together to provide a common facility. They were empowered to create a new corporation and political subdivision to acquire, construct, own and operate such sanitary disposal facility. Such new entity was empowered to finance the acquisition and construction of such facility by issuing revenue bonds to be repaid solely from the revenues derived from the operation of the facility. Section 28F.5 provides in part as follows:

Such an entity shall have the power to fix, establish and maintain such rates, tolls, fees, rentals or other charges and collect the same * * * for the payment of the services and facilities provided by said project or projects. Such rates, tolls, fees, rentals and other charges shall be so fixed, established and maintained and revised from time to time whenever necessary as will always provide revenues sufficient to pay the costs of maintaining, repairing and operating the project or projects, to pay the principal and interest on the bonds then outstanding. [And to provide certain reserves.]

Section 28F.6 provides that the bonds shall not in any respect be general obligation bonds of any public agency. In *Goreham v. Des Moines Metropolitan Area Solid Waste Agency,* 179 N.W.2d 449 (1970), the Supreme Court of Iowa upheld the right of Metro to issue revenue bonds for the purposes set forth in the statutes. It also held that the municipalities could not pay the charges levied against them from general revenues or by a property tax assessment.

The only feasible way in which solid waste facilities could be acquired and constructed was through the issuance of revenue bonds. As the legislature enacted a comprehensive scheme to authorize and encourage the issuance of such bonds, it obviously contemplated that revenue bonds would be issued. As the legislature mandated that fees and charges be levied to pay such bonds as well as operate and maintain the facilities, it must have intended for the agencies to do what was necessary to assure the revenues, including the enactment of anticompetitive ordinances and regulations. The agencies were informed that the challenged action was necessary to make the revenue bonds salable. The anticompetitive provisions are for the protection of the bondholder.

In the Court's opinion the action taken by the defendants is the kind of action that the

legislature must have contemplated when it mandated its subdivisions to provide facilities for the disposal of solid waste and authorized the issuance of revenue bonds to finance the acquisition and construction of such facility. The Court concludes that the agencies in requiring solid waste from the Metro area to be deposited at its landfill site so long as there are revenue bonds outstanding is acting pursuant to the state policy to displace competition with regulation and a monopolistic form of public service. The action complained of is a necessary and reasonable consequence of the authority and direction given the State's subdivisions by the Iowa Legislature. *Cf.: New Motor Vehicle Bod. of Cal. v. Orrin W. Fox Co.,* supra; *Gold Cross Ambulance,* 538 F.Supp. 956 (W.D.Mo.1982); *Highfield Water Co. v. Public Service Commission,* 488 F.Supp. 1176 (D.Md.1980). In the Court's opinion the state has properly directed its instrumentalities to act in a manner which might otherwise be inconsistent with antitrust laws.

The Supreme Court cases also indicate that the state action exemption requires that the state policy must be actively supervised by the State itself. *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). Although there may be some question as to the advisability of requiring state supervision of public entities and the extent of such supervision if required, the Supreme Court, 1977 Term, 92 Harvard L.Rev. 57, 283–284, the Court is of the opinion that the supervision requirement is satisfied in this instance by Iowa Code Sections 455B.4, 455B.5, 455B.77, 455B.78, 455B.79, 455B.80 and 455B.83, together with the provisions of Chapters 28E and 28F and the general auditing provisions of the Code applicable to political subdivisions.

The Court therefore concludes that the defendants have established that the state action exemption from the application of the antitrust laws applies and that judgment should be entered in favor of the defendants and against the plaintiff for the costs of this case.

IT IS SO ORDERED.