**CENTRAL IOWA REFUSE SYSTEMS, INC., Appellant,**

v.

**DES MOINES METROPOLITAN SOLID WASTE AGENCY, et al., Appellees.**

Nos. 83–1039, 83–1107.

United States Court of Appeals, Eighth Circuit.

Argued June 15, 1983.

Decided Aug. 26, 1983.

---

James E. Brick, Brick, Seckington, Bowers, Swartz & Gentry, P.C., Des Moines, Iowa, for appellees except City of Des Moines, Iowa.

R. Michael Hayes, City Sol., Intergovernmental Programs, Des Moines, Iowa, for appellee City of Des Moines, Iowa.

F. Richard Lyford, Barbara G. Barrett, of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, for appellant.

Before HEANEY, Circuit Judge, and GIBSON and ROSENN,* Senior Circuit Judges.

ROSENN, Senior Circuit Judge.

This antitrust case raises a difficult question concerning the "state action" exemption from the federal antitrust laws. Plaintiff Central Iowa Refuse Systems, Inc. (CIRS) brought this action against the Des Moines Metropolitan Area Solid Waste Agency (Metro), and its constituent members, Polk County, Iowa and fifteen Iowa municipalities including the city of Des Moines (the municipal defendants). Metro operates a solid waste disposal site within the Des Moines metropolitan area, and plaintiff CIRS operates a similar facility outside the metropolitan area. The plaintiff's complaint alleged violations of sec-

---

* Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

tions 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, as well as Iowa antitrust law, arising out of Metro's attempt to require that all solid waste generated within the geographic area covered by Metro be disposed of at Metro's facilities.[1]

The district court, 557 F.Supp. 131, held, on the basis of stipulated facts, that the defendants' activities were protected from antitrust scrutiny by the state action exemption from the federal antitrust laws, and entered judgment for the defendants. The plaintiff now appeals from this determination.[2] We affirm.

### I.

The seeds of this litigation were sown over fifteen years ago. In the mid-1960's, the city of Des Moines recognized that its municipal dump was rapidly becoming unable to accommodate the increasing quantities of refuse produced within the city. Knowing that several neighboring municipalities were experiencing similar problems, the City Manager of Des Moines proposed that the municipalities enter into a cooperative arrangement to construct adequate modern waste disposal facilities. In November 1966, the municipalities retained two consulting firms to conduct an engineering study, funded largely by a grant from the United States Public Health Service.[3] The engineers' report, submitted in May 1968, recommended the formation of a single agency to manage the collection and disposal of all solid waste produced in the entire Des Moines metropolitan area. Such a cooperative effort was permitted under a newly-enacted chapter of the Iowa Code, Chapter 28E, which authorized political subdivisions of Iowa to join together to provide important and necessary services and facilities.[4] Under Chapter 28F of the Iowa Code, enacted in 1969, such intergovernmental projects were to be financed by the issuance of revenue bonds.

In July 1969, the municipalities availed themselves of the provisions of Chapters 28E and 28F and established Metro. A formal intergovernmental cooperative agreement was executed in December 1969, expressly providing for financing of the project by revenue bonds.[5]

During 1971, Metro developed a plan for a single solid waste landfill on a site 10 miles east of Des Moines. At the same time, each of the municipalities and Metro entered into a Solid Waste Disposal Service Contract (the Service Contract) setting forth schedules of rates to be paid by the municipalities to Metro for disposal of refuse.[6] Based on recommendations from

---

1. The plaintiff invoked the district court's jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and over the state antitrust claims under the doctrine of pendent jurisdiction.

2. Certain of the defendants filed a cross-appeal, contesting the district court's preliminary determination that the activities complained of satisfied the Sherman Act's interstate commerce requirement. At oral argument this challenge was abandoned and the defendants conceded that their activities had a substantial effect on interstate commerce.

3. The federal government had numerous financial assistance programs designed to encourage states and local governments to develop comprehensive plans for solid waste disposal. One example was the Solid Waste Disposal Act of 1965. See 42 U.S.C. §§ 6901–6987.

4. Significantly, in May 1970, aware of the critical problem in solid waste disposal, the Iowa legislature enacted sections 455B.75–.83 for the

purpose of encouraging municipalities to "provide sanitary disposal projects for the final disposition of solid wastes by their residents and, thereby, protect the citizens of this state from such hazards to their health, safety, and welfare that result from the uncontrolled disposal of solid wastes." See 1970 Iowa Legis.Serv. at 336 § 1. This statute required that municipalities establish and maintain solid waste disposal systems, and, like Chapter 28E, provided for cooperative arrangements between governmental units.

5. The Supreme Court of Iowa ruled that the delegation of legislative power to the municipalities and Metro under chapters 28E and 28F of the Iowa Code was proper under the Iowa constitution. *Goreham v. Des Moines Metropolitan Area Solid Waste Agency,* 179 N.W.2d 449 (Iowa 1970).

6. Under Section 401 of the Service Contract, each of the Municipalities agreed to adopt an ordinance prior to the execution of the Service Contract authorizing the levying and collection

Metro's bond consultants, the municipalities included in the Service Contract two provisions for the protection of the bondholders which would facilitate the underwriting and sale of the bonds. Section 105 of the Service Contract provided:

> *Disposal.* The municipality does hereby agree, that to the full extent permitted by law, all Solid Waste generated from within its jurisdiction shall be disposed of at the Project.

In addition, under section 701 the Municipalities agreed that during the time the revenue bonds were outstanding, the Municipalities would not grant any license for any facility to compete with Metro.[7] These provisions were included to guarantee the broadest possible financial base for Metro's activities, as a means of making the revenue bonds an attractive investment. The bond consultants believed that, in view of prevailing conditions in the financial markets, the bond issue would be unmarketable without these provisions.[8]

In October 1972, Metro duly issued pursuant to resolution $1,500,000 of revenue bonds to finance the construction of the landfill. This resolution constitutes a contract between Metro and the bondholders. In accordance with the Solid Waste Disposal Service Contract, it was contemplated that the funds to pay the bondholders would come out of charges to be collected for use of Metro facilities. The bonds are secured by a lien on and a pledge of the revenues derived from the operation of the Metro facility. By 1974, however, only two of the municipalities in Metro had enacted ordinances requiring that all solid waste generated within their jurisdiction be disposed of at the Metro landfill. Accordingly, in 1974 Metro obtained a declaratory judgment in Iowa District Court for Polk County construing the exclusivity provisions in sections 105 and 701 of the Service Contract to require "that all solid waste within the territorial boundaries of the City of Des Moines ... be transported to the [Metro] site ... until such time as the bond obligations of [Metro] are retired," and requiring that all transfer stations within the Des Moines area deposit all solid waste at the Metro landfill. As a result of this litigation, most of the constituent municipalities passed ordinances requiring persons collecting solid waste to bring the refuse to Metro's landfill or to other waste transfer stations for subsequent hauling to the Metro landfill. In addition, some members of Metro passed ordinances making it a crime to take solid waste produced within the jurisdiction to any place other than Metro's facilities.

Plaintiff CIRS is in the business of operating waste collection and disposal services in central Iowa. Until 1980, as part of this business, it operated a sanitary landfill in Madison County, 31 miles from the Des Moines central business district and outside the metropolitan area covered by Metro. CIRS brought this action in January 1979, ten years after the formation of Metro and over six years after the revenue bonds were issued. CIRS claimed that because of the

---

of rates, charges, tolls, and other fees for the services and facilities of the Metro project. Each municipality adopted such a rate ordinance.

7. Section 701 provided in pertinent part:

> *Non-Competitive Facilities.* So long as any Bonds of the Agency are outstanding, the Municipality shall not grant any franchise or license to any person, firm, association or corporation for a competing solid waste disposal system, nor shall they permit any municipal solid waste disposal system to compete with the Agency....
>
> The Agency however shall have the right to establish, construct and acquire any other disposal project, provided, however, that no

such other disposal project shall be so established, constructed or acquired unless the Consulting Engineers shall certify that such other disposal project will not be competitive with said Project constructed and acquired pursuant to the terms of the Resolution, and will not materially or adversely affect the revenues to be derived from said Project, or the rights and security of the holders of the Bonds issued pursuant to said Resolution.

8. In addition, the municipalities were apprehensive that, unless future revenues could be assured, the municipalities themselves might become liable for any default by Metro in paying the bondholders. This would violate section 28F.6 of the Iowa Code, which required the cooperative project to be self-supporting.

exclusivity provisions of the Service Contract, CIRS and other persons collecting refuse within the area covered by Metro were not allowed to dispose of that refuse at the landfill operated by CIRS in Madison County. The plaintiff argued that this provision prevented CIRS from competing with Metro in the disposition of solid waste, and thus amounted to a restraint of trade in violation of federal and state antitrust laws.[9] CIRS also accused Metro and the municipalities of monopolizing and attempting to monopolize the disposal of solid waste. The district court found it unnecessary to consider the question of liability, believing that the alleged anticompetitive arrangement was protected by the state action exemption to the federal antitrust laws.

## II.

The state action antitrust exemption had its origin in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Supreme Court held that the federal antitrust laws did not prevent the state of California from instituting a marketing program for raisins. Although such a program might well have been a violation of the Sherman Act if it had been privately run, the Court held that the state's involvement exempted the program from antitrust scrutiny. Explaining that the State of California, "as sovereign, imposed the restraint as an act of government," *id.* at 352, 63 S.Ct. at 314, the Court stated that the Sherman Act "must be taken to be a prohibition of individual and not state action." *Id.*

The *Parker* decision rested on basic principles of federalism. The Court determined that neither the express language nor the legislative history of the Sherman Act evidenced an intention on the part of Congress to restrain state action. *Id.* at 350, 63 S.Ct. at 313. The Court therefore applied the general presumption against federal preemption of state law, explaining that "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 351, 63 S.Ct. at 313.

The *Parker* decision raised more questions than it answered. One of the most important of these questions was whether the antitrust exemption for "state action" encompasses actions by subordinate governmental entities, such as cities. The Court finally addressed this issue five years ago in *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). *City of Lafayette* involved a claim under the Sherman Act by a private utility company against several Louisiana cities, challenging various anticompetitive practices in the operation of the cities' own electric utility systems. The Supreme Court rejected the defendants' contention that municipalities, like states, are automatically exempt from the strictures of the federal antitrust laws. In a plurality opinion for four members of the Court, Justice Brennan wrote that the municipalities could not avail themselves of the state action exemption for the simple reason that cities are not states.

> What CIRS does challenge here is the defendants' method of insuring the economic success of its project by destroying competition; i.e., requiring that, as long as the bonds are outstanding, all solid waste generated from within the Metro area be deposited at the Metro site, and the enforcement of that anti-competitive activity by way of permits and criminal ordinances. Such conduct obviously cannot be justified as a proper exercise of the Defendants police power since the requirement is not tied to a health or welfare concern but rather to a financial one.

**9.** In its brief to the district court, plaintiff explained:

> CIRS does not challenge the establishment of the Metro facility. It does not dispute the municipalities' powers to regulate the disposal of refuse and garbage, either pursuant to the municipal police power to promote and preserve the welfare and convenience of the people (citation) or pursuant to statutory mandate (citation). It does not challenge the municipalities ability to jointly exercise their powers to provide for joint facilities, including sanitary disposal projects.

Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them. *Parker's* limitation of the exemption to "official action directed by a state" is consistent with the fact that the States' subdivisions generally have not been treated as equivalents of the States themselves. In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach.

435 U.S. at 412–13, 98 S.Ct. at 1136–37 (footnote and citations omitted).[10]

Despite its unwillingness in *City of Lafayette* to equate municipal action with state action, the plurality observed that a municipality could invoke the *Parker* doctrine in situations where the challenged conduct genuinely reflected state policy. The plurality emphasized that the *Parker* doctrine exempts "anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. Although there must be a "clearly articulated and affirmatively expressed" state policy decision behind anticompetitive conduct by municipalities, *see id.* at 410, 98 S.Ct. at 1135, the plurality made it clear that such a policy statement need not be a legislative directive to engage in anti-competitive actions, nor even a detailed authorization. "[A]n adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" 435 U.S. at 415, 98 S.Ct. at 1138 (footnote omitted) (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434 (5th Cir.1976)). The state must have had some expectation that the municipality would engage in economic regulation of the particular area, but it need not specifically have directed the municipality to act in a certain way.[11]

The Court again considered the matter of state action immunity for municipalities in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In *Community Communications,* a majority of the Court endorsed the analysis of the plurality opinion in *City of Lafayette,* stating that the anticompetitive restraint imposed by the City of Boulder (an ordinance placing a moratorium on the expansion of cable television) "cannot be exempt from antitrust scrutiny unless it constitutes the action of the State of Colorado itself in its sovereign capacity, or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Id.* at 52, 102 S.Ct. at 841 (citations omitted). The Court held that a "home rule" provision in the Colorado constitution granting autonomy to municipalities with respect to local matters did not constitute the "adequate state mandate" necessary to invoke the *Parker* exemption.

> [P]lainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended

10. In a concurring opinion, Chief Justice Burger developed the theory that municipal conduct should be subject to antitrust strictures if it was "proprietary" in nature but not if it was "governmental" in nature. *See* 435 U.S. at 418, 98 S.Ct. at 1139.

11. State authorization can perhaps be inferred from concurrent state acts evincing a policy favoring regulation or from a delegation of authority to a municipality to act in an area which has customarily been regulated in an anticompetitive manner. *See* Note, *The Application of Antitrust Laws to Municipal Activities,* 79 Colum.L.Rev. 518, 523 (1979).

within the powers *granted*," since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality.... [I]n Boulder's view, it can pursue its course of regulating cable television competition, while another home rule city can choose to prescribe monopoly service, while still another can elect free-market competition: and all of these policies are equally "contemplated," and "comprehended within the powers granted." Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of "clear articulation and affirmative expression" that our precedents require.

*Id.* at 55–56, 102 S.Ct. at 843 (emphasis in original). Thus, it is clear after *Community Communications* that conduct of a subordinate governmental entity will not fall within the *Parker* state action exemption unless the State plays an affirmative role by, at the very least, providing the impetus for the anticompetitive activity.

▮ Recently, this circuit has analyzed the *Parker* doctrine in terms of two requirements for immunity for municipal conduct. First, the state legislature must have authorized the challenged municipal activity. Second, and more important, the legislature must have intended to displace competition with regulation or some form of monopoly public service. *See Gold Cross Ambulance & Transfer & Standby Service, Inc. v. City of Kansas City,* 705 F.2d 1005, 1011 (8th Cir.1983).

### III.

In the instant case, plaintiff CIRS challenges the requirement imposed by Metro and the defendant municipalities that as long as the revenue bonds are outstanding, all solid waste produced within the Metro area is to be deposited at the Metro landfill. Plaintiff does not challenge either the establishment of Metro or the power of the municipalities jointly to regulate the disposal of refuse in the Des Moines metropolitan area. Plaintiff's claim is that Metro acted illegally in attempting to monopolize the disposal of solid waste produced in the Des Moines area and preventing the depositing of refuse at CIRS' landfill in Madison County.

Thus, the question is whether this alleged anticompetitive activity by Metro constitutes action "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 52, 102 S.Ct. at 841. We must ascertain whether the Iowa legislature authorized the challenged activity and, if so, whether it did so with an intent to displace competition. *See Gold Cross Ambulance v. City of Kansas City, supra;* P. Areeda, Antitrust Law ¶ 212.3a, at 53 (1982 Supp.).

It cannot be denied that in the 1970's the Iowa state legislature made a deliberate policy decision to encourage the construction of sanitary landfills by local governments. Under the provisions of Chapter 455 of the Iowa Code, the cities and counties of Iowa are required to provide for environmentally safe and sanitary disposal of solid waste. *See* Iowa Code §§ 455B.76–.84.[12] This statute authorizes cities and counties to join together, pursuant to the provisions of Chapter 28 of the Iowa Code, to provide common disposal facilities.[13]

It is also clear that the Iowa legislature contemplated that such joint undertakings of municipalities under Chapter 28 would be financed through the issuance of revenue

---

**12.** These sections, however, do not require that the cities and counties actually establish and operate such facilities themselves. The municipalities could have complied with their statutory obligation by contracting with private parties.

**13.** The statute also provides for administrative supervision and regulation of disposal facilities by the Iowa Environmental Quality Commission.

bonds. *See* Iowa Code, Chapter 28F. The bonds were to be repaid out of the revenues derived from operation of the facility. Section 28F.5 specifically provides, in pertinent part:

Such an entity shall have the power to fix ... fees, rentals or other charges and collect the same from the public agencies participating in the agreement .... for the payment of the services and facilities provided by said project .... Such ... fees, rentals or other charges shall be so fixed, established and maintained and revised from time to time whenever necessary as will always provide revenues sufficient to pay the cost of ... operating the project ... to pay the principal of and interest on the bonds then outstanding ... [and to provide certain reserves and provide for repairs].

In addition, section 28F.6 expressly states that the revenue bonds are not to be general obligation bonds of any public agency, but are to be secured by and repaid out of the revenues realized from the project.

Nonetheless, there is no state statute or other authority indicating that the Iowa legislature actually contemplated that the agency responsible for construction and operation of the landfill facility would have the exclusive right to dispose of solid waste produced in the Des Moines area or would engage in practices in restraint of trade. Plaintiff argues that because the anticompetitive provisions were included in the Service Contract only to ensure the financial success of the Metro Project, and not for any public health or welfare reason, the restriction on competition in disposal services was not within the scope of the activities authorized by Iowa legislation.

■ Admittedly, one must engage in some speculation to determine whether the State of Iowa genuinely intended to displace competition in the disposal of solid waste. We agree with the district court, however, that notwithstanding the statutes' silence on the specific matter of monopolization, it is possible to infer the existence of an affirmative state policy permitting anti-competitive practices in the operation of municipal landfills.

An examination of the statutory provisions behind Metro's formation reveals that the Iowa legislature placed an extremely high priority on the activities of Metro and other inter-governmental agencies engaged in the disposal of solid waste. The comprehensive statutory scheme makes clear that the Iowa legislature encouraged cities and counties to join together to provide facilities for the disposal of solid waste. Moreover, the provisions of Chapter 455B, enacted in 1970, require every city and county in Iowa to provide for sanitary disposal facilities. The reasonable and perhaps even inescapable conclusion from this statutory scheme is that the legislature desired agencies such as Metro to have broad discretion to do whatever was necessary to ensure their success.

■ CIRS insists, however, that there is no basis for concluding that the Iowa legislature contemplated that Metro would monopolize the disposal of solid waste produced within the Des Moines area. Plaintiff emphasizes that the Iowa statutes did not impose on local governments any obligation to construct their own landfills. Although the municipalities were required to provide for the establishment of solid waste disposal facilities, they had the option of doing so by contracting with private enterprise. Plaintiff points to *Community Communications, supra,* in which the Supreme Court held that "a State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." 455 U.S. at 55, 102 S.Ct. at 843.

We believe the instant case is not controlled by *Community Communications* because the State's position here is not "one of mere neutrality respecting the municipal actions challenged as anticompetitive." 455 U.S. at 55, 102 S.Ct. at 843. As we recently pointed out in *Gold Cross Ambulance v. City of Kansas City, supra,* 705 F.2d at 1013–14, the city's anticompetitive cable television ordinance in *Community Communications* was passed pursuant to a home rule provision in the Colorado constitution that

failed even to refer to cable television. There was no indication of any Colorado legislative policy regarding this industry; the State simply had never considered the matter. *See* 455 U.S. at 55, 102 S.Ct. at 843. By contrast, in the instant case, as in *Gold Cross Ambulance, supra,* the State of Iowa has affirmatively addressed the matter regulated by the municipalities. Indeed, the legislature has gone so far as to express its support for those municipalities electing to cooperate in the construction of common refuse facilities. Thus, although the State has left Iowa municipalities with a range of options concerning how best to provide for sanitary disposal facilities, by no means has the state adopted an approach of indifference or "mere neutrality." *See also Town of Hallie v. City of Eau Claire,* 700 F.2d 376 (7th Cir.1983). The State obviously has been very much concerned with the problem of state-wide solid waste disposal.

Plaintiff argues, however, that it requires an unwarranted leap to conclude that the state legislature actually contemplated the imposition of restrictions on competition in the disposal of solid waste in order to promote the financial viability of projects such as Metro. Chapter 28F.5 authorizes entities such as Metro to set rates, fees, and charges to insure sufficient revenue to pay for the bonds. Plaintiff asserts that the legislature may have expected that this power alone would be sufficient to guarantee the financial viability of the project. Thus, even assuming Metro's bond consultants were correct in their opinion that the revenue bonds would not be marketable without the anticompetitive provisions in the Service Contract, plaintiff argues that there is no indication that the state legislature considered such a step necessary to ensure the financial viability of Metro.[14]

■ We believe that the Iowa legislature did indeed contemplate these restrictions on competition. Chapter 28F expressly authorizes municipalities to finance collective projects by issuing revenue bonds. When ascertaining what was in the minds of the legislators, we cannot ignore the realities of the municipal bond market in the mid 1970's. The legislature surely realized the importance of assuring a source of repayment in order to make the bonds marketable. Common sense and experience suggest that the Iowa legislature must have intended Metro to have the latitude necessary to impose restrictions on competition if Metro believed such restrictions necessary to promote the sale of the bonds. The bond experts had convinced Metro that the restrictions were essential for marketing the bonds. In short, even though the legislation does not speak to the precise question whether restraints of trade could be employed to guarantee the financial vitality of Metro, the comprehensive legislative scheme favoring the development of solid waste facilities demonstrates that the legislature intended the localities to have broad authority to act in furtherance of the legislative mandate.[15] Thus, we believe that the restraint on competition was a "necessary or reasonable consequence" of engaging in the authorized activity of constructing a waste disposal facility with funds raised by revenue bonds. *See Gold Cross Ambulance v. City of Kansas City, supra,* 705 F.2d at 1013; Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L. Rev. 435, 446 (1981).

The instant case is distinguishable from a case involving, for instance, a cooperative effort among governmental subdivisions to construct a recreational swimming pool. Without evidence that a state legislature considered such a swimming pool to be a high priority project, we would be unwilling to infer that the unauthorized anticompetitive actions of local governments were

---

**14.** Plaintiff also points out that the constituent municipalities in Metro could guarantee the financial stability of the agency by assessing a fee on all property owners in the area. This would eliminate the need for any monopoly of the disposal of solid waste, and would be permissible, since the activities of Metro involve the public health and welfare.

**15.** Indeed, this conclusion is strengthened by the Iowa Supreme Court's interpretation that Chapters 28E and 28F authorize the issuance of revenue bonds and the use of restrictions on competition to protect the liquidity and merchantability of the bonds. *See Goreham v. Des Moines Metro Area Solid Waste Agency, supra,* 179 N.W.2d at 457–58.

within the contemplation of the legislature. In this modern era, however, the construction of solid waste disposal facilities is an essential governmental activity, and the obvious importance that the Iowa legislature placed on projects such as Metro justifies a broad interpretation of what the legislature must have contemplated. Thus we believe that Metro initiated its anticompetitive conduct pursuant to state policy, and such conduct is exempt from the federal antitrust laws under the *Parker* doctrine.

## IV.

Plaintiff contends that, even if the restriction on disposal of refuse generated within the Des Moines area was pursuant to a clearly articulated and affirmatively expressed state policy, as required by *City of Lafayette* and *Community Communications, supra,* the defendants' anticompetitive conduct is still not immunized from antitrust scrutiny because it was not actively supervised by the state itself.

Where private parties claim the benefit of the state action exemption, they are required to show active state supervision of the challenged restraint. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 104–06, 100 S.Ct. 937, 942–43, 63 L.Ed.2d 233 (1980). *See also City of Lafayette v. Louisiana Power & Light Co, supra,* 435 U.S. at 410, 98 S.Ct. at 1135; *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The Supreme Court has not decided whether this active supervision requirement also applies to anticompetitive activities of municipal governments. *See Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14. This circuit, however,

has recently held that a showing of state supervision is unnecessary where the restraint represents governmental conduct in an area of traditional municipal activity. *Gold Cross Ambulance & Transfer & Standby Service, Inc. v. City of Kansas City, supra,* 705 F.2d at 1014–15. *Accord Town of Hallie v. City of Eau Claire, supra,* 700 F.2d at 383–84 (7th Cir.1983). Metro's refuse disposal operations were within a well defined area of traditional municipal activity and thus we need not address the district court's reasoning that the supervision exercised by the State of Iowa over the activities of Metro was sufficient to satisfy the requirements of the state action exemption set forth in *California Retail Liquor Dealers Association v. Midcal Aluminum, supra.*[16]

Accordingly, the judgment of the district court dismissing the plaintiff's complaint is affirmed.[17]

---

**16.** In view of the district court's dismissal of the federal antitrust claims, dismissal of the pendent state antitrust claims was warranted.

**17.** Relying upon *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the defendants have also argued that, even apart from the *Parker* exemption, their activities are protected from antitrust scrutiny by the tenth amend-

ment to the United States Constitution. Because we hold that the *Parker* exemption applies, there is no need for us to consider the defendants' constitutional argument. It should be noted, however, that once the revenue bonds have been retired, the legislative justification for the anticompetitive provisions will disappear. If the ordinances are still in effect and plaintiff chooses to challenge them at that time, the *Parker* exemption might no longer be available to Metro.