Gene P. SCOTT, Joyce A. Scott, Arnold W. Madsen, Mary G. Madsen, John A. Connolly, Frank Fitch, As Trustees of the John L. Connolly Trust, Appellants,

v.

CITY OF SIOUX CITY, IOWA, Metro Center, Inc., George Cole, Margaret Prahl, William Gross, Loren Callendar, Thomas Lindblom, Donald L. Lawrenson, Larry Clausen and Jan Albertson, Appellees.

No. 83–1934.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1984.

Decided June 8, 1984.

Lance A. Coppock, Edward W. Remsburg, Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, Iowa, for appellees, City of Sioux City, Iowa and council members; James Abshier, City Atty., Sioux City, Iowa, of counsel.

David E. Vohs, William L. Heubaum, Bikakis, Heubaum, Titus, Vohs & Storm, Sioux City, Iowa, for appellants.

Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.

HEANEY, Circuit Judge.

The appellants, owners of land near the southern city limits of Sioux City, Iowa, challenge the district court's grant of summary judgment to the defendant city and its council members in their action under the federal antitrust law, 15 U.S.C. §§ 1 and 2; the Civil Rights Act, 42 U.S.C. § 1983; and the Iowa Competition Law, Iowa Code Ann. § 553.4 (West Supp.1983). The city council passed zoning ordinances which allegedly prevented the appellants from commercially developing their land on the city's periphery. The appellants allege the ordinances were the product of an agreement between the council and a downtown developer, Metro Center, Inc., to prevent competition with planned downtown redevelopment. The district court held that the city and its council were immune from antitrust liability under the state action doctrine; that the council members had absolute legislative immunity from the action brought under section 1983; and that the constitutional claims against the city were legally unsupportable. We affirm.

## I.

## BACKGROUND

Iowa passed an urban renewal law in 1957, Iowa Code Ann. §§ 403.1–403.20 (West 1976). The stated policy of that statute is to halt the physical decay of Iowa cities and the accompanying growth of urban social problems. The statute provides that each local government may formulate a workable program for using private and public resources to further urban renewal goals. Every city has the authority to prepare, adopt and revise from time to time a general plan for the physical development of the municipality as a whole. Section 403.6 delegates to every municipality the "powers necessary or convenient to carry out and effectuate the purposes and provisions of the urban renewal law," *id.* at § 403.6, including the power to execute contracts for redevelopment, and to "zone or rezone any part of the public body," *id.* at § 403.12(1).

Sioux City officials and businesses have been increasingly concerned with downtown development since the mid-1960's. In 1964, a committee of downtown businesses and community leaders submitted a plan to the city council evaluating alternatives for maintaining a viable business climate in the city. The city council appointed a Central City Committee to formulate recommendations for orderly development of the central business district. The city applied for

funds from the federal government to prepare a General Neighborhood Renewal Plan encompassing 215 acres and to plan a three-block total clearance project know as Central Business District-East (CBD–E). Eventually, the city acquired real estate in the CBD–E, offered it for redevelopment to private parties, and issued bonds for the construction of parking garages and other improvements. Meanwhile, an eleven-block area adjacent to the CBD–E was also targeted for redevelopment and designated the Central Business District-West (CBD–W). The city applied for federal assistance to survey and plan this area in 1966 but did not receive the funds until 1971. The city thereafter proceeded with active redevelopment of the CBD–W and entered into redevelopment agreements with a private developer, Metro Center, Inc.,[1] in February of 1974.

At the time the city council contracted with Metro Center, its president was Howard Weiner who had been a member of the Sioux City Council from January of 1973 to November 7, 1973. Weiner lost his bid for re-election to the city council and became president of Metro Center three weeks later. Metro Center submitted the sole bid to redevelop three parcels in the CBD–W. Its proposal included plans for a major hotel, department stores, a convention center and related commercial development. Under the redevelopment contract, the city was obligated to obtain federal grants for the CBD–W area, secure real estate, clear the property for redevelopment, and provide streets, sidewalks, street lights and other urban utilities. In return, Metro Center was obligated to purchase the property from the city, build the commercial facilities it had proposed, procure financing and secure tenants.

The appellants acquired their property along the southern limits of Sioux City in 1962. In 1966, the city annexed the property and apparently zoned it to permit commercial development. In May of 1974, soon after the city entered into the contract with Metro Center, the appellants sold 19 acres of this land to General Growth Properties, a real estate development company, for the development of a regional shopping center. The appellants retained approximately 70 acres of adjoining land which they allege they planned to develop commercially to take advantage of business drawn to the regional shopping center. As part of the purchase agreement, the appellants agreed to construct roads to facilitate the area development. When the transaction was complete, the parties publicly announced General Growth's plans to develop a regional shopping center.

The prospect of a regional shopping center competing for commercial tenants with the downtown project concerned Weiner, the president of Metro Center. Weiner states in his deposition that he talked to council members about the importance of limiting commercial development outside the downtown and specifically about the threat posed by General Growth's plan for a regional shopping center. On July 22, 1974, the city council enacted the Interim Development Ordinance which temporarily suspended unplanned development within the city pending the completion of the Plan and Zoning Commission's comprehensive review of the general plan and zoning ordinance. The interim ordinance did not change any zoning classifications, but it restricted the issuance of building permits, approval of site plans in designated areas, and certain types of residential and commercial development.

In November, 1975, appellant Gene Scott requested a "preplat" conference with the planning department and an informal review of the proposed development of his property under the Interim Development Ordinance. The Community Development Director advised the council that the request was in conflict with the provisions and policy of the interim ordinance. On February 17, 1976, the city council granted a conditional variance for preparation of a grading plan only. Scott never applied for a building permit or variance under either the interim ordinance or the permanent ordinance enacted by the city council on August 2, 1976. The permanent ordinance

---

1. Metro Center is a named defendant in this case, but is not a party to this appeal.

also left appellants' property with a zoning classification that does not allow for the development of a regional shopping center and other retail commercial developments.

The appellants filed their original complaint on January 19, 1979. The complaint alleged violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and was amended December 3, 1981 to allege a violation of the Civil Rights Act, 42 U.S.C. § 1983. The appellants contended that the city and its council members conspired with Weiner and Metro Center to prevent the appellants from developing their land around General Growth's planned regional shopping center. On December 15, 1982, the district court rejected the defendants' first motion for summary judgment holding that the state action immunity doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), did not shield the municipal defendants and that, in view of this Court's decision in *Westborough Mall v. City of Cape Girardeau*, 693 F.2d 733 (8th Cir. 1982), *cert. denied*, — U.S. —, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983), appellants' civil rights claim presented a question for the jury. On May 3, 1983, the court also denied a renewed motion for summary judgment in which the defendants contended that the Iowa Urban Renewal Law provided state authorization sufficient to trigger state action immunity. The court subsequently reconsidered that denial in light of our then-recent opinion, *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983), *cert. filed*, 52 U.S.L.W. 3039 (1983), and granted the defendants' summary judgment motion on June 17, 1983. This appeal followed.

## II.

### ANTITRUST CLAIMS

■ The initial issue in this case is whether the state action doctrine shields the municipal defendants from liability for violations of the federal antitrust laws.[2]

### A. State Action Doctrine.

The Supreme Court established state action immunity from the federal antitrust laws in *Parker v. Brown, supra*, 317 U.S. at 350–351, 63 S.Ct. at 313. It held a California marketing program enacted by the state legislature was exempt from challenge under the Sherman Act because the program "derived its authority from the legislative command of the state." *Id.* at 350, 63 S.Ct. at 313. Because neither the Sherman Act itself nor its history suggested an intent to restrain state legislative action, the Court declined to extend the reach of antitrust liability to include such action:

In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 350–351, 63 S.Ct. at 313.

The Supreme Court has since had occasion to address the question of whether, and under what circumstances, state action immunity is available to a state's municipalities.[3] In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), a plurality of four Justices rejected the claim that the state action doctrine extends to "all governmental entities, whether state agencies or subdivisions of the state * * * simply by reason of their status as such." *Id.* at 408, 98 S.Ct. at 1134. The Court emphasized that cities have not historically been treat-

---

2. The district court granted summary judgment on all claims, apparently including the actions brought under the Iowa Competition Law. The appellants do not specifically challenge the dismissal of the state claim, rather they contend the district court erred in holding the state action doctrine was applicable here.

3. Other Supreme Court decisions have further refined the *Parker* state action doctrine. *E.g., Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

ed as the equivalent of states and that serious economic dislocation could result if cities were free to place their own parochial interests above the national economic goals reflected in the antitrust laws. *Id.* at 412–413, 98 S.Ct. at 1136. The Justices nonetheless acknowledged that a state may choose to effectuate its policies through the instrumentality of its municipalities. Thus, the *Parker* doctrine would exempt from the ambit of antitrust liability municipal anticompetitive conduct engaged in "pursuant to state policy to displace competition with regulation or monopoly service." *Id.* The state policy relied on would have to be "clearly articulated and affirmatively expressed." *Id.* at 410, 98 S.Ct. at 1135. This does not mean the municipality must be able to point to a specific, detailed legislative authorization; rather, an adequate state mandate exists when the authority given to the municipality to operate in a certain area indicates "that the legislature contemplated the kind of action complained of." *Id.* at 415, 98 S.Ct. at 1138.[4]

In *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court held that a state's general grant of extensive powers of self-government, or "home rule," to its municipalities does not provide specific enough state authorization to trigger state action immunity. Boulder had passed an ordinance prohibiting a cable television company from expanding its business in the city. Boulder claimed state action immunity because of its status as a home rule municipality. The Supreme Court disagreed, stating "the requirement of 'clear articulation and affirmative expression' is not satisfied when the state's position is one of mere *neutrality* respecting the municipal actions complained of as anticompetitive." *Id.* at 55, 102 S.Ct. at 843 (emphasis in original). A legislature cannot be said to have contemplated specific conduct if it allows a municipality to do what it pleases. *See id.*

This Circuit has had the opportunity to address the state authorization aspect of state action immunity in cases where a specific state statute engendered the challenged city actions. In *Gold Cross Ambulance & Transfer v. City of Kansas City, supra,* 705 F.2d at 1015, we held that Missouri's comprehensive statutory scheme regulating ambulance service in the state authorized the single-operator ambulance system adopted by Kansas City. In *Central Iowa Refuse Systems, Inc. v. Des Moines Metro Solid Waste Agency,* 715 F.2d 419 (8th Cir.), *cert. filed,* 52 U.S.L.W. 3441 (1983), a private solid waste disposal facility challenged a city agency's requirement that all solid waste generated in its jurisdiction be disposed of at its own facilities. We held state authorization for such activity could be implied from an Iowa statute which encouraged the construction of sanitary landfills by local governments and contemplated that revenue bonds would finance joint undertakings by cities and counties to provide common disposal facilities. *Id.* at 425–427.

These cases analyzed the state action immunity issue in two steps: First, the state legislature must have authorized the challenged municipal activity. Second, the legislature must have intended to displace competition. *Gold Cross Ambulance & Transfer v. City of Kansas City, supra,* 705 F.2d at 1101; *Central Iowa Refuse Systems, Inc. v. Des Moines Metro Solid Waste Agency, supra,* 715 F.2d at 425. *See also,* Areeda, Antitrust Law ¶ 212.3a at 53 (Supp.1982). Reasoning from the language in *City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 415, 98 S.Ct. at 1138, which states that the necessary legislative intent exists where "the legislature contemplated the kind of action complained of," we held the state policy to displace competition can be inferred "if the challenged restraint is a necessary and reasonable consequence of engaging in the authorized activity." *Gold Cross Ambulance & Transfer v. City of Kansas City, supra,* 705 F.2d at 1013; *see*

4. This standard has since been adopted by a majority of the Court. *Community Communica-* *tions Co. v. City of Boulder,* 455 U.S. 40, 50–51, 102 S.Ct. 835, 840–41, 70 L.Ed.2d 810 (1982).

*Central Iowa Refuse Systems, Inc. v. Des Moines Metro Solid Waste Agency, supra,* 715 F.2d at 427; Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 446 (1981).

### B. *The State's Authorization.*

To determine whether the state authorized the acts complained of we must first determine what those acts are. The appellants specifically challenge the council's passage of the ordinances which prevented them from commercially developing their land. They also challenge the council's dealings with Metro Center prior to the passage of the ordinances. Thus, the first question is whether the Iowa Urban Renewal Law authorized both zoning in furtherance of urban renewal goals and the relationship between the city and Metro Center complained of here.

The Iowa Urban Renewal Law gives both general and specific authorization for a municipality's use of zoning power to further the policy of urban renewal. Two extremely broad grants of power are contained in the statute. Section 403.6 begins with the statement that "[e]very municipality shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this chapter." Iowa Code Ann. § 403.6 (West 1976). Section 403.12 echoes this broad authorization giving local public bodies the powers to do "any and all things necessary to aid or cooperate in the planning or carrying out of an urban renewal project." *Id.* § 403.-12(1)(c).[5] The specific powers granted to municipalities for urban renewal include the power to zone or rezone any part of the municipality or public body. *Id.* §§ 403.6(8) & 403.12(1)(h).

The appellants argue the city's power to zone to further its urban renewal plan is limited to those areas that have been designated for redevelopment. The breadth of the grant of power contained in these provisions, together with the language authorizing zoning or rezoning of any part of the municipality or public body, belies any such limitation in the state's authorization. Thus, the urban renewal law clearly authorized Sioux City to zone outlying areas of the city to protect urban renewal goals.

Iowa's urban renewal law also authorizes municipalities to contract with private developers for the commercial redevelopment of a designated urban renewal area. The municipality may acquire real estate in a designated area. *Id.* §§ 403.6(3) & 403.7. That property may then be sold, leased or otherwise transferred to private companies to be developed for, among other things, commercial uses. *Id.* § 403.8(1). The private purchasers are obligated to devote the property to uses specified in the overall urban renewal plan and other public interest requirements determined by the municipality. *Id.* The municipality furnishes roads, public utilities, and other public improvements for the urban renewal project. *Id.* § 403.6(2). Thus, Iowa law authorized the contract between the Sioux City Council and Metro Center and also, presumably, their preliminary dealings together as contracting parties.

The more difficult question is whether the Iowa Legislature intended to sanction the specific zoning ordinances complained of here. The district court, following our opinion in *Gold Cross Ambulance,* held that because Sioux City's zoning was a necessary and reasonable consequence of engaging in the authorized urban renewal activity, the intent element was satisfied. The court found the city's ordinances were necessary to protect its investment in its downtown development. The court further found that the ordinances were not an unreasonable consequence of the state's goal of promoting urban redevelopment combined with the broad authority vested in the municipalities to accomplish this goal.

---

**5.** Section 403.6 enumerates the powers delegated to municipalities. Iowa Code Ann. § 403.6 (West 1976). Section 403.12 enumerates the powers granted to public bodies, *id.* § 403.12, which includes political subdivisions of the state, *id.* § 403.17(3). Thus, the powers included in both sections are delegated to the state's municipalities, although section 403.6 specifically addresses municipalities.

We agree with the district court that the importance the Iowa Legislature placed on urban renewal, and the broad powers it gave to municipalities to address the problem, support a finding that the legislature contemplated the type of zoning ordinances passed by Sioux City. The Iowa Legislature considered the decay of its urban areas a serious threat to the economic, social and physical welfare of state residents. It noted that the existence of slum and blighted areas contributes to the spread of disease and crime, reduces tax revenues, impairs the growth of municipalities and retards the provision of housing accommodations.[6] *Id.* § 403.2(1). To combat this "growing menace," the legislature empowered municipalities not only to zone, inspect, and regulate private real estate, but to do all things necessary to assure the success of their urban renewal projects.[7] The legislature's deep concern and broad delegation of power contributes to our finding that it contemplated the challenged zoning.

A more compelling reason to find the necessary legislative intent, however, is that the legislature has put municipalities in the position of partially financing commercial development. The Iowa Urban Renewal Law allows cities to raise a substantial amount of money for their urban renewal ventures through federal and local government loans, tax levies and the is-

suance of bonds. *Id.* §§ 403.6(5), 403.6(8) & 403.9. The district court found Sioux City had raised approximately $30 million in public financing to support its urban renewal project.

We can assume that the state legislature appreciated the harsh economic realities faced by the city that undertakes such a project. In *Central Iowa Refuse Systems, Inc. v. Des Moines Metro Solid Waste Agency, supra,* 715 F.2d at 427, this Court held the Iowa Legislature contemplated a monopoly by a metropolitan solid waste facility when it authorized the financing of such facilities by revenue bonds. "When ascertaining what was in the minds of the legislators, we cannot ignore the realities of the municipal bond market in the mid 1970's. The legislature surely realized the importance of assuring a source of repayment in order to make the bonds marketable." *Id.*

Similarly, here, the state legislature must have anticipated that once a municipality became financially and legally committed to commercial development in urban areas, it would use its delegated powers, including the power to zone and rezone, to protect that commitment. Consultants to the Sioux City Council advised discouraging shopping centers in favor of the downtown because dispersing major retailing fa-

---

6. Iowa Code Ann. § 403.2 (West 1976) provides in pertinent part:

1. It is hereby found and declared that there exists in municipalities of the state slum and blighted areas, as herein defined, which constitute a serious and growing menace, injurious to the public health, safety, morals and welfare of the residents of the state; that the existence of such areas contributes substantially and increasingly to the spread of disease and crime, constitutes an economic and social liability imposing onerous municipal burdens which decrease the tax base and reduce tax revenues, substantially impairs or arrests the sound growth of municipalities, retards the provision of housing accommodations, aggravates traffic problems and substantially impairs or arrests the elimination of traffic hazards and the improvement of traffic facilities; and that the prevention and elimination of slums and blighted areas is a matter of state policy and state concern * * *.

7. In addition to the general grant of all powers "necessary or convenient to carry out and effectuate the purposes and provisions of this chapter," section 403.6 specifically empowers municipalities, among other things, to carry out urban renewal projects; to make and execute contracts; to disseminate slum clearance information; to contract for the repair and furnishing of all services and facilities for or in connection with an urban renewal project; to acquire any real or personal property for administrative purposes and to hold, improve, clear or prepare such property for development; to encumber or dispose of any real property; to invest urban renewal project funds; to obtain money from the federal, state or county government; to make all necessary surveys and planning; to plan for the relocation of people and businesses; to appropriate funds; to levy taxes; to zone and rezone any part of the municipality; to sell and convey real property. Iowa Code Ann. § 403.6 (West 1976).

cilities among several locations in a market of Sioux City's scale would reduce the chances of success for the downtown project.[8] The challenged ordinances were thus a reasonable and necessary consequence of the city's role in implementing state urban renewal goals.

In sum, we hold the Sioux City ordinances meet both prongs of the state action immunity test as stated in *Gold Cross Ambulance:* First, the Iowa Legislature, in both general and specific provisions of the Iowa Urban Renewal Law, authorized the challenged activities—zoning to protect urban renewal goals and the relationship between the city and Metro Center. Second, the legislature contemplated that municipalities might enact the type of ordinances enacted by Sioux City. We base this latter conclusion on the belief that the city's zoning action is the necessary and reasonable consequence of allowing municipalities to join in downtown redevelopment projects with private commercial developers and to invest substantial sums of public money in such projects.

The district court also properly concluded that the state action doctrine did not require the state to actively supervise the challenged restraint. The Supreme Court has required active state supervision in those cases where it has extended state action immunity to private entities or individuals. *See, e.g., California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 99, 100 S.Ct. 937, 940, 63 L.Ed.2d 233 (1980); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 582, 96 S.Ct. 3110, 3113, 49 L.Ed.2d 1141 (1976). In *Gold Cross Ambulance & Transfer v. City of Kansas City, supra,* 705 F.2d at 1014, we held, however, that the state supervision requirement is not applicable to municipal officials. Unlike private parties, municipal officials are accountable for their decisions to the citizens they represent. State supervision is therefore less necessary to prevent abuse of power. Moreover,

while the state authorization requirement for municipal decisions tests whether the challenged local activity is truly state action, the state supervision requirement serves that function for private conduct. *Id.*

The appellants argue that, after *Gold Cross Ambulance,* state supervision is still applicable when a municipality is engaged in conduct outside the scope of traditional governmental functions. We need not reach this issue because we agree with the district court that zoning for urban renewal purposes is a traditional governmental function designed to protect public health and safety. The mere investment of public funds does not make a project proprietary rather than governmental. *See Central Iowa Refuse Systems, Inc. v. Des Moines Metro Solid Waste Agency, supra,* 715 F.2d at 428. We thus conclude active state supervision of Sioux City's urban renewal projects and attendant zoning decisions was not necessary to shield Sioux City and its officials from antitrust liability in this case.

### C. *Acts Outside the State's Authorization.*

Our holding that the Iowa Urban Renewal Law provides a clear and affirmative expression of a state policy favoring Sioux City's action does not end our inquiry. The appellants assert the city council acted outside the state authorization and thus its actions cannot be shielded from antitrust liability. They allege that the city's zoning decision was the product of an anticompetitive "conspiracy" between the city and Metro Center rather than urban renewal policy. They further allege that because the city council did not follow the procedures outlined in the urban renewal statute for amending the plan when it passed the challenged ordinances, it forfeited state authorization.

A city council could conceivably violate the antitrust laws by entering into an

---

**8.** *Scott v. City of Sioux City,* C79–4009, slip op. at 11 (W.D.Iowa April 4, 1983) (order for final pretrial conference).

agreement with a private developer to restrain trade. *See Westborough Mall v. City of Cape Girardeau, supra,* 693 F.2d at 746; *Mason City Center Association v. City of Mason City,* 671 F.2d 1146, 1149 (8th Cir.1982); *Whitworth v. Perkins,* 559 F.2d 378, 381 (5th Cir.1977), *vacated on other grounds,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978); Areeda, Antitrust Law, *supra,* ¶ 203.3 at 12–13. In this case, however, the appellants have alleged no actions which appear outside the ambit of the city's antitrust immunity.

As previously stated, the city is immune from antitrust liability for passage of the interim and permanent ordinances. The appellants nonetheless intimate that the city should be subject to antitrust liability because Metro Center urged the council members to pass the ordinances.[9] We reject this contention. Antitrust immunity is meaningless in this context unless it extends to the council's proper dealings with Metro Center prior to the council's official zoning action. The Iowa Urban Renewal Law authorized Sioux City's joint endeavor with Metro Center to redevelop the city's decaying commercial district. Metro Center thus had legitimate reason to discuss with council members the effect a regional shopping center would have on their joint project. Since the state has authorized both the business relationship between the city and Metro Center and the city's zoning actions, it is clear that Metro Center's proper dealings with the council fall within the ambit of antitrust immunity.

The appellants point to the relationship between the president of Metro Center, Howard Weiner, and some of the city council members as proof of an anticompetitive agreement. Weiner was on the city council just prior to becoming president of Metro Center. Metro Center submitted the sole bid to redevelop CBD–W while Weiner was on the council. Weiner states in his deposition that he had close personal friendships with at least five of Sioux City's council members. He talked to these and other members of the council about General Growth's plans for a regional shopping center and urged the council to take preemptive action. Based on his deposition, there is no doubt Weiner used his best efforts to get the council to pass the ordinances favoring the downtown project.

Without the broad grant of immunity in this case, Weiner's activities may have preserved the conspiracy question for the jury. In *Westborough Mall v. City of Cape Girardeau, supra,* 693 F.2d at 746, we stated that "a conspiracy to thwart normal zoning procedures and to directly injure the plaintiffs by illegally depriving them of their property is not in furtherance of any clearly articulated state policy." In that case, however, we did not have specific legislative authorization of the acts complained of and the requisite legislative intent. We do not think Sioux City should be deprived of immunity simply because Weiner knew some of the council members and perhaps talked to them personally about factors important to the success of the downtown project. The purpose of state action immunity is to allow states and municipalities with state authorization to pursue health and welfare goals without threat of antitrust liability. That purpose would be frustrated in this case if the mere label "conspiracy" were enough to warrant an antitrust trial. The appellants do not allege that the council members were involved in bribery or other illegal acts. We thus conclude the appellants' allegations do not remove the municipal defendants from the ambit of antitrust immunity.

Neither do we find the appellants' allegation that the city departed from the state mandated procedures in passing the challenged ordinances adequate grounds for stripping the city of immunity. The city's departure from state procedural requisites would have to be extreme to warrant the threat of antitrust liability. State authorization for antitrust purposes does not re-

---

**9.** Because we find state action immunity shields the defendants in this case, we need not discuss possible immunity under the *Noerr-Pennington* doctrine. *See United Mine Workers v. Penning-* *ton,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

quire administrative decisions that are free from ordinary errors. As a commentator recently noted:

> The *Lafayette* authorization requirement should not be manipulated in such a way as to thwart the fundamental *Parker* policy against antitrust scrutiny of state action. The antitrust court should require no more than that the result of the agency's. act or decision was of the sort contemplated by state anticompetitive policy. "Ordinary" errors or abuses in the administration of jurisdiction conferred by the state should be left for state tribunals to review.

Areeda, Antitrust Law, *supra*, ¶ 212.3b at 57.

Here, the appellants apparently allege the city did not amend its general urban renewal plan before enacting the ordinances. We do not view this error to be of a magnitude that necessitates abrogating the city's antitrust immunity.

In sum, we do not believe a material issue of fact exists as to whether the city acted outside the state's authorization for antitrust purposes either in its dealings with Metro Center prior to passing the challenged ordinances or in the procedures followed to enact them. We therefore affirm the district court's grant of summary judgment to the municipal defendants on appellants' antitrust claims.

## III.

### CONSTITUTIONAL CLAIMS

The district court also granted the municipal defendants summary judgment on the appellants' constitutional causes of action brought under 42 U.S.C. § 1983. The appellants' broadly worded complaint alleges that the city's zoning action deprived them of equal protection, substantive due process, procedural due process, and constitut-

ed a taking without just compensation. The district court rejected the appellants' constitutional claims and also held that the city council members had absolute legislative immunity. Because we agree that the appellants' constitutional claims are meritless, we affirm on that basis and do not address the legislative immunity issue.

The appellants claim they were denied substantive due process because the city's ordinances denied them the right to use their property in accordance with the zoning classification in effect when they made their initial plans to commercially develop the property. We agree with the district court that the ordinances do not infringe on any fundamental rights.[10] Thus, the ordinances survive a substantive due process challenge if they were designed to accomplish an objective within the government's police power, and if a rational relationship existed between the provisions and purpose of the ordinances. *Gold Cross Ambulance & Transfer v. City of Kansas City, supra,* 705 F.2d at 1015. A finding that the ordinances had a rational basis also defeats the appellants' equal protection claim.

 As explained in the antitrust section of this opinion, the city designed the interim and permanent ordinances to further its urban renewal goals. The state's urban renewal law clearly placed this objective within the city's power. Moreover, the ordinances were rationally related to the goal of urban renewal. The city had already made a substantial investment in revitalizing its downtown commercial district. It had good reason to believe the investment would fail if competing regional shopping centers siphoned off the market. Because the city had a rational basis for passing the challenged ordinances, we hold summary judgment was proper on the appellants' substantive due process and equal protection claims.[11]

---

**10.** The appellants contend the ordinances infringed on their fundamental right to receive just compensation for a taking. We think that the appellants' taking claim should stand or fall on its own merit, rather than serve as a back door for other constitutional challenges.

**11.** The appellants question whether the city's proffered rationale is the real reason the city passed the ordinance. As long as a rational basis exists, however, it need not be the real reason for the governmental action to satisfy substantive due process. *See, e.g., Williamson v.*

■ The appellants' procedural due process claim must also fail. To sustain a procedural due process claim, the appellants must first establish that they possessed "a legitimate claim of entitlement" to the zoning and building permits which would allow commercial development of their land. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). This entitlement could be based upon state or local law or upon an express contract or mutual understanding with the defendants. *See id.* at 577–578, 92 S.Ct. at 2709; *Perry v. Sindermann,* 408 U.S. 593, 600–603, 92 S.Ct. 2694, 2699–700, 33 L.Ed.2d 570 (1972); *Brockell v. Norton,* 688 F.2d 588, 590–591 (8th Cir. 1982). For example, under Iowa vested rights law, the appellants might have acquired a property right in the use of their commercial zoning if they made legitimate and valuable expenditures before passage of the ordinance on the assumption the land would retain its commercial zoning. *See Nemmers v. City of Dubuque,* 716 F.2d 1194, 1197–1198 (8th Cir.1983).[12] Application for a building permit at a time when commercial development was permissible under the applicable ordinances might also have created a claim of entitlement sufficient to trigger due process guarantees. *See Scott v. Greenville County,* 716 F.2d 1409, 1418 (4th Cir.1982) (applying South Carolina law). Here, however, appellants do not allege they had applied for any building permits or made any appreciable expenditures before the interim ordinance was passed.[13] Without a legitimate

claim of entitlement, the appellants' procedural due process claim fails.[14]

■ Similarly, the appellants' taking claim is without merit. The city's action did not confiscate the appellants' property, it merely diminished the land's value. Diminution in value, standing alone, does not establish a "taking." *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Appellants allege no facts which would take their claims outside this general rule.

In sum, we affirm the district court's grant of summary judgment on the appellants' section 1983 claims.

## IV.

## CONCLUSION

We agree with the district court that under this Circuit's precedents, Sioux City is shielded from antitrust liability. The state legislature authorized municipalities to invest public money in joint ventures with private developers to renew decaying urban areas. The legislature delegated to the municipalities general and specific powers to do all things necessary, including zoning and rezoning all parts of the municipality, to assist and protect these urban renewal projects. In our view, Sioux City's ordinances protecting the downtown commercial district are a reasonable and necessary consequence of the state's authorization. Furthermore, because the Iowa Ur-

---

*Lee Optical Co.,* 348 U.S. 483, 490, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

**12.** The appellants have belatedly asserted the vested rights theory to this Court as a separate cause of action. This theory is a matter of state law not actionable under 42 U.S.C. § 1983. *See Nemmers v. City of Dubuque,* 716 F.2d 1194, 1197 (8th Cir.1983).

**13.** The appellants do not allege in either their complaint or their amended complaint that they spent any money preparing their land for commercial development. Scott's deposition contains some reference to expenditures made to prepare a plat, but that was after the passage of

the interim ordinance. Although the district court found these expenditures were significant enough to confer standing, *see Scott v. City of Sioux City,* No. C79–4009 slip op. at 4 (N.D.Iowa Dec. 17, 1982) (unpublished order), they are not sufficient to create a vested right under Iowa law. *See Nemmers v. City of Dubuque, supra,* 716 F.2d at 1197–1198.

**14.** At oral argument the appellants' attorney asserted that the city had promised the appellants commercial zoning when the land in question was annexed to the city. The existence of such an agreement was not alleged before the district court, and we decline to consider it here.

ban Renewal Law also authorized the council's dealings with Metro Center prior to passage of the ordinance, they are also accorded antitrust immunity. Finally, we also affirm the district court's grant of summary judgment on the appellants' section 1983 action.