PARAGOULD CABLEVISION,
INC., Plaintiff,

v.

CITY OF PARAGOULD, ARKANSAS,
et al., Defendants.

No. J–C–90–14.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

May 9, 1990.

James W. McHaney, Jr., Little Rock, Ark., David R. Goodson, Paragould, Ark., Bruce D. Sokler, Washington, D.C., for plaintiff.

Robert F. Thompson, Donis B. Hamilton, Paragould, Ark., for defendants.

## ORDER

EISELE, Chief Judge.

In this action plaintiff seeks injunctive relief for alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 2 (1976), the First and Fourteenth Amendments to the United States Constitution. as well as the laws of the State of Arkansas. At issue before the Court are defendant City of Paragould and its Light and Water Commission's Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff has responded. The Court will grant the motions for the reasons indicated in the body of this Order.

## I. THE STANDARD ON MOTIONS TO DISMISS

■ Under a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted the complaint is to be construed in the light most favorable to plaintiff and its allegations are taken as true. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See also Baxley–DeLamar Monuments, Inc. v. American Cemetery Association*, 843 F.2d 1154 (8th Cir.1988).

■ The critical issue is the sufficiency of the complaint which is governed by the pleading standard stated in Rule 8(a). A pleading setting forth a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Included then, in the determination of whether a claim is stated is the calculus of whether relief can be granted on this claim. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

The sufficiency requirement most frequently utilized is derived from the Supreme Court's pronouncement that

in appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Mindful of these guiding principles, the Court addresses defendants' motions.

## II. FACTS

### A. Parties and Jurisdiction

Plaintiff Paragould Cablevision, Inc. ("PCI") is a Massachusetts corporation headquartered and with its principal place of business in Greene County, Arkansas. Plaintiff operates a cable television system in Paragould, Arkansas under a franchise

agreement entered into on November 28, 1983.

The complaint names 16 defendants including the City of Paragould ("the City"), its Light and Water Commission ("LWC"), the mayor and 13 individual members of the City Council and the Light and Water Commission. Paragould is an incorporated city and the LWC is a municipal entity created under A.C.A. § 14–200–106 with the charge to operate the City's water and electric systems.

Jurisdiction lies under Section 16 of the Clayton Act of 1914, codified at 15 U.S.C. § 26, 42 U.S.C. § 1983, 28 U.S.C. § 1331 and by pendant jurisdiction over the State law claims. Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391(b).

### B. Background

The Franchise Agreement entered into between the City and PCI was explicitly termed non-exclusive. In the past seven years, plaintiff has had no competition in the operation of its cable system in Paragould. However, on June 17, 1986 an ordinance authorizing the construction and operation of a municipal cable system was approved by referendum vote and on January 16, 1989, a franchise agreement was concluded between the City and LWC for the latter to build and operate a system in Paragould. To finance the municipal system, the City conducted a referendum vote to authorize issuance of $3.22 million of municipal bonds which passed on October 31, 1989. On January 22, of this year, the City acted pursuant to the referendum and authorized the bonds to be issued.

### C. The Nature of the Claims Alleged

Plaintiff's 17 page complaint alleges numerous violations in three Counts which are divided among antitrust violations, violations of the First and Fourteenth Amendments, and breach of state contract law claims respectively.

The alleged Sherman Act violations derive from the Section 2 monopoly prohibition which states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

Plaintiff alleges *inter alia* that its Count I claims assert "its right to be free from unfair and illegal competition brought about by Defendants' dual role as a direct competitor of Cablevision and as a utility operator with exclusive control over utility poles which are vital to the existence of Cablevision." Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, p. 2 (hereafter "Plaintiff's Memorandum"). Specifically, plaintiff asserts a monopoly leverage theory of liability which is defined as "the use of monopoly power in one market to amplify or 'leverage,' a position in another competitive market." *Kerasotes Michigan Theatres v. National Amusements*, 854 F.2d 135, 137 (6th Cir.1988), *cert. dismissed*, —— U.S. ——, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989) (citations omitted). Here, the defendants are alleged to possess a monopoly over the electricity and water services and are allegedly attempting to "leverage" their economic power in the cable television market. The acts comprising violations under this theory are (1) LWC's ownership of electric utility poles and its power, under the Pole Attachment Agreement, entered into by PCI and LWC, to restrict PCI's use of those poles and to terminate the Agreement under certain circumstances; (2) the failure to correctly assess and include the cost of the relocation of utility poles necessary for installation of LWC's cable system wires in the financial estimates for the project used by the City; and (3) LWC's plan to string cable wire in alleged violation of certain spacing safety

standards promulgated in the National Electric Safety Code.

Defendants assert their immunity to antitrust liability under the "State Action Immunity" doctrine and argue that, in any event, not only does the complaint fail to state a Sherman violation but any alleged violations have yet to occur and are unripe.

Plaintiff in Count II alleges violations of the First and Fourteenth Amendments stemming from restrictions imposed on PCI's unfettered right to sell and transmit advertising in the absence of similar restrictions on LWC's ability to do likewise. Plaintiff finds that these contractual disparities constitute regulation of legitimate commercial speech in the absence of substantial state interest. PCI also alleges that the restrictions amount to "selective taxation in a situation where, all things being equal, one party remains exempt from taxation and the other party does not." *Id.* p. 19.

For their part, defendants argue that a probable franchise fee of 3% on any additional advertising is not so burdensome as to rise to the level of a First Amendment violation and the claim of unequal treatment in a contractual setting similarly does not state a violation of the Fourteenth Amendment.

Count III alleges breaches of good faith and fair dealing amounting to contractual breach under Arkansas law.

Defendant seeks dismissal under *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), for lack of federal jurisdiction over the pendant state claims.

### III. THE ANTITRUST CLAIMS

#### A. Legislative Immunity

 As an initial matter the Court finds that plaintiff's claims against the individual members of the City Council and the members of the LWC under 42 U.S.C. § 1983 are barred. Legislators are absolutely immune from suit for all damages or injunctive relief when performing their roles "in a field where legislatures traditionally have power to act." *Tenney v. Brandhove*, 341 U.S. 367, 379, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951); *Green v. De-Camp*, 612 F.2d 368 (8th Cir.1980). When engaged in the implementation of laws, city or executive officers are not absolutely immune. *See e.g. Latino Political Action Comm. v. City of Boston*, 581 F.Supp. 478 (D.C.Mass.1984), *aff'd*, 784 F.2d 409 (1st Cir.1986).

Here, there is no allegation that the individuals named as defendants acted in any capacity other than their official ones. The City Council and the LWC have not been said to have implemented laws in violation of the constitutional rights of plaintiff.

It is also a point worthy of note that although municipalities are granted immunity from damages arising from their anticompetitive acts in violation of the antitrust laws under the Local Government Antitrust Act of 1964, 15 U.S.C. §§ 34–36, this act

> in no way affects a plaintiff's ability to bring suit against a local government for injunctive relief against 'threatened loss or damage by a violation of the antitrust laws' under Section 16 of the Clayton Act, 15 U.S.C. § 26. Nor does it prevent the award of reasonable attorney's fees to a plaintiff 'substantially prevailing' in such a suit. In such injunctive actions, the defendant(s) would be forced to rely on traditional antitrust analysis, rather than the Local Antitrust Act, to seek immunity or to establish other defenses.

Sinel, *The Lawful Regulation of Cable Television*, 241 PLI/Pat 259, p. 44 (Westlaw) (1987). We now reach the issue of immunity under traditional antitrust doctrines.

#### B. State Action Immunity

##### 1. *The Basis for the Doctrine*

 States are possessed of immunity from antitrust liability when acting as the "sovereign". *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The source of this rule has been alternatively attributed to the needs of federalism under the model of preemption or to an exceptional status accorded states under the anti-

trust regime. Under federalism theory courts recognize the existence of two sovereigns, the federal and the state. The operative inquiries are: has the federal government exclusively occupied the field and even if not, are the laws of the federal and state governments so in conflict as to irrevocably collide. In the words of Chief Justice Stone, "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker* at 351, 63 S.Ct. at 313.

Under the rubric of "state action exemption," a term often used by courts, we observe that there is only one sovereign on display, the federal power, and that this sovereign may permit certain exceptions:

> courts routinely presume that antitrust is the dominant national policy and that, accordingly, it should be displaced only where there is plain repugnancy between the enactments—and even then "only to the minimum extent necessary." Since most federal regulations postdate the passage of the Sherman Act in 1890, the tendency is to regard regulation as an alien intruder into antitrust's domain. Thus the exemption cases are generously sprinkled with such shibboleths as "[r]epeals of the antitrust laws by implication ... are strongly disfavored). (Citations omitted).

Handler, *Antitrust–1978*, 78 Colum.L.Rev. 1374, 1378–79 (1978) (quoted in Kalinowski, 6 *Antitrust Laws and Trade Regulation*, § 46.04[1] (1989)).

The Supreme Court has decided cases since *Parker* under both doctrinal heads but it seems clear that the doctrines are in conflict. In *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) and in *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) the Court's holdings were bottomed on the immunity-as-exception theory. The dissenters in *Community Communications v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) *rev'g* 630 F.2d 704 (10th Cir.1980) opined the majority's neglect of the Supremacy Clause and "our

basic notions of federalism." *Id.,* 455 U.S. at 61, 102 S.Ct. at 845.

> Because pre-emption treads on the very sensitive area of federal-state relations, this Court is "reluctant to infer pre-emption," [citation omitted] and the presumption is that pre-emption is not to be found absent the clear and manifest intention of Congress that the federal Act should supersede the police powers of the States. [Citation omitted].

*Id.* In recent cases the Court has invoked preemption concerns as the basis for the immunity but has not resisted the siren call of terming the immunity "state action exemption." *See 324 Liquor v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987), *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 1662, 100 L.Ed.2d 83, *reh'g denied,* 487 U.S. 1243, 108 S.Ct. 2921, 101 L.Ed.2d 952 (1988).

### 2. *The Parker Doctrine Applied to Municipalities*

While *Parker* taught that a state's otherwise anticompetitive acts would not be scrutinized under the same penetrating eyepiece as private entity's, it did not reach the issue of the status of the state's political subdivisions.

In *City of Lafayette, supra,* the Supreme Court expressly removed cities from the broad *Parker* immunity on the basis of their status alone. The immunity conferred by *Parker* was formulated as follows: "*Parker* exempts only anti-competitive conduct engaged in as an act of government by the State as sovereign, or by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." 98 S.Ct. at 1137. Whenever cities act as "agents" of the State they are "free to implement state policies without being subject to antitrust laws to the same extent as would the State itself." *Id.* The question of when a local entity is active in the guise of "agent" is answerable when the State's grant of "authority ... to operate in a particular area [indicates] that the legislature contemplated the kind of action complained of" in the antitrust complaint. *Id.* at 1138. Legislative contemplation was heralded as "a

clearly articulated and affirmatively expressed" policy but a city need not be "be able to point to a specific, detailed legislative authorization."

Four years later the Court found that a city operating by dint of its home rule power rather than under authority of the state was not cloaked in *Parker* immunity. The operative determination in *City of Boulder, supra,* was the neutrality of the state *vis a vis* Boulder's decision to restrain the expansion of its private cable company's service. "A state that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anti-competitive actions for which the municipal liability is sought." Thus the outer reaches of municipal *Parker* immunity were defined.

With the parameters of immunity taking recognizable shape, the Court proceeded to refine the doctrine of municipal *Parker* immunity in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). The Court's opinion effectively removed the second prong of the traditional two prong test for state action immunity stated by *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). There, in the context of anti-competitive activities of a state sponsored private party, in addition to the grant of authority by a state, active state supervision was required for immunity to apply. Whether supervision was also required when the actor was a local unit of government was left in the air, even in *Boulder.* *Town of Hallie* grounded the issue and held: "[w]e now conclude that the active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Id.,* 105 S.Ct. at 1720.

3. *"Clearly Articulated and Affirmatively Expressed State Policy"*

The issue before the Court is whether the City of Paragould and its Light and Water Commission acted under a "clearly articulated and affirmatively expressed state policy." The Court will treat the potential liability of the LWC as coterminous with that of the City unless a distinction presents itself.

In *L & H Sanitation v. Lake City Sanitation,* the Eighth Circuit summarized its *Parker* inquiry in two steps:

First, the state legislature must have authorized the challenged municipal activity. Second, the legislature must have intended to displace competition. [Citation omitted]. [T]he state policy to displace competition can be inferred "if the challenged restraint is a necessary and reasonable consequence of engaging in the authorized activity."

769 F.2d 517, 521 (8th Cir.1985). *See also Scott v. City of Sioux City,* 736 F.2d 1207, 1211 (8th Cir.1984); *Gold Cross Ambulance v. City of Kansas City,* 705 F.2d 1005, 1013 (8th Cir.1983) *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). The opinion in *L & H Sanitation* affirmed this Court's finding of municipal immunity for Lake City's grant of an exclusive franchise for disposal of its solid waste. The Court found that in passing the Arkansas Solid Waste Management Act conferring broad authorities on cities to regulate the disposal of their solid waste the legislature intended for municipalities to take action to "displace competition" and that such acts would be "a necessary consequence of engaging in the authorized activities." *Id.* at 522.

Plaintiff here argues that while the City's *decision* to enter into the Paragould cable market is no violation of the Sherman act, its "intent to destroy any competition in cable television in Paragould," that is, its *"methods,"* do "state an antitrust claim." Plaintiff's Memorandum, p. 8–9. And, argues plaintiff, citing dicta in a footnote in this Court's decision in *Brazil v. Arkansas Board of Dental Examiners,* "if the agency or municipality exceeds the bounds of its authority to establish trade restraint, *Parker* immunity will not attach." 593 F.Supp. 1354, 1361 n. 5 (E.D.Ark.1984), *aff'd,* 759 F.2d 674 (8th Cir.1985). Of course, the issue of whether the City has acted *ultra vires* will be decided by the same process as the determination of whether immunity should attach, the exist-

ence of proper state authorization. Plaintiff's argument is therefore tautological.

In 1987 the General Assembly of Arkansas passed two statutes relating to cable television. The first, contained in Act 328 of 1987 § 1, and codified at A.C.A. § 14–199–601, states in subsection (a):

Any first-class city, second-class city, and incorporated town may own, construct, acquire, purchase, maintain, and operate a television signal distribution system for the purpose of receiving, transmitting and distributing television impulses and television energy, including audio signals and transient visual images, to the inhabitants of the city or town and to the inhabitants of an area not to exceed two (2) miles outside the boundaries of the city or town.

To this general grant of power is appended a second, more specific statute, 14–199–602, which provides, with Levitical precision that:

[t]he city or town may erect, construct, operate, repair, and maintain in, upon, along, over, across, through, and under its streets, alleys, highways, and public grounds, poles, cross-arms, cables, wires, guywires, stubs, anchors, towers, antennas, pipes, connections, and other appliances, fixtures, and equipment necessary, expedient, or useful in connection with a television signal system.

Municipal capital improvements, including "facilities for the generation, transmission, and distribution of television communications" may be financed by issuance of municipal bonds, subject to the passage of an authorizing ordinance and approval by the electorate of the municipality. A.C.A. §§ 14–164–303, 309 (1989).

Predictably, plaintiff argues that "the generalized language used in the authorizing statutes cited by Defendants is not nearly enough to provide the overbroad exemption Defendants are claiming." Plaintiff's Memorandum, p. 6. Plaintiff is mistaken.

The Court notes that plaintiff terms the grant of powers to cities, "general," but the Court would add to that characterization the adjectives "broad," and even, without much hyperbole, "sweeping" and "comprehensive." The Court therefore finds that these statutes authorize the entry of the city into the market and reflect the state's policy to permit the city "to displace competition" since "the challenged restraint is a necessary and reasonable consequence of engaging in the authorized activity." *L & H Sanitation, supra.* The Court also finds that the legislature necessarily contemplated the possibility that cities would choose to develop their own cable television systems despite the anticompetitive nature of that decision. Defendant's argument directed to this point is well taken.

The clear delegation of control to cities over their television systems expressed in the cited statutes makes the Court's finding of immunity for the City and its LWC relatively straightforward. *See also* Saylor, *Selected Antitrust Issues Facing Cable Television Operators, Suppliers and Competitors,* 267 PLI/Pat 107 (1989). *Cf. City Communications, Inc. v. City of Detroit,* 888 F.2d 1081 (6th Cir.1989) (city immune because state constitutional grant to municipalities to control the public streets reasonably foresaw decision by local government not to renew non-exclusive franchise even without mention of cable television); *Consolidated Television Cable Service, Inc. v. City of Frankfort,* 857 F.2d 354, 359–62 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989) (*Parker* immunity attaches since state statute expressly contemplates municipal ownership of public utilities and state constitution expressly contemplates franchising of public utilities); *Best View Cablevision, Inc. v. City of Abbeville,* 798 F.2d 1408 (4th Cir.1986) (nonrenewal and order to vacate poles was within express South Carolina statutory authorization to 'regulate' cable operations and was immune under *Parker*); *Catalina Cablevision Associates v. City of Tucson,* 745 F.2d 1266 (9th Cir.1984) (city's grant of nonexclusive franchise and rejection of plaintiff's application were actions pursuant to a state statute expressly empowering city to restrict operation and construction of cable

systems and, hence, were immune under *Parker*); Moreover, the Court notes that [n]arrowly drawn, explicit delegation is not required. The Supreme Court has never held 'that the challenged municipal conduct need be inescapably mandated by the State."

*Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396, 1413–14 (9th Cir.1985), *aff'd on other ground,* 476 U.S. 488, 106 S.Ct. 2034, 2036, 90 L.Ed.2d 480 (1986). As understood by the Supreme Court in its early pronouncement in *City of Lafayette:*

> [w]ere it otherwise, the specter of antitrust liability would unduly hamper the state's ability to allocate governmental authority between itself and its subdivisions. Restricted too would be its use of municipalities to regulate areas requiring flexibility and the exercise of wide discretion at the local level.

98 S.Ct. at 1138 (plurality opinion).

With the finding that state action immunity attaches to the acts of the City and the LWC the Court will not reach the merits of plaintiff's claim of monopoly leveraging violations or any other violations under § 2 of the Sherman Act. Count I of the complaint will be dismissed in its entirety.

## IV. THE FIRST AND FOURTEENTH AMENDMENT CLAIMS

The First Amendment is applicable to the states by incorporation into the Fourteenth Amendment. The First Amendment protects commercial speech subject to significant limitations. The initial inquiry, of course, is whether or not speech is implicated at all in the state action that is the subject of the claim. In other words, is there regulation and if so, does that regulation infringe on protected speech. If so found the reviewing court must ascertain whether the commercial speech concerns a lawful activity and is not misleading or fraudulent. Once these initial hurdles are cleared the court must employ a three-part test. The interest of the government in the particular regulation must be "substantial," the regulation must "directly advance" the government's asserted interest,

and finally, it must be "no more extensive than necessary." *Posados de Puerto Rico Associates v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

■ Plaintiff first claims that the provision of its 1983 Franchise Agreement that requires PCI to engage in a process of negotiation and modification of its Agreement with the city should it choose to air advertisements on its cable networks violates its First Amendment rights. Section 2.4 reads in relevant part as follows:

> This agreement does not cover major technical advances in TV reception and use, in cable TV or in TV-related technology such as, but not limited to, two-way capability, teleconferencing, or use of inexpensive individual satellite receivers or components thereof. It does not cover additional income-producing activities of Grantee such as advertising over Grantee's cable TV system. If Grantee should decide to offer services to subscribers involving these or other major technical advances or to undertake other income producing activities, it will first notify the City and offer its proposed modification to this Agreement to cover such additional services and activities, and the proposed modification shall be subject to negotiation.
>
> \* \* \* \* \* \*
>
> The parties also recognize that such advanced technology may make cable TV as contemplated by this Agreement obsolete or virtually certain to be unprofitable to the operator. Upon the practical advent of any such technical advance, either party may propose that this Agreement be opened for further negotiation and modification so that each party may better protect its interests.

Plaintiff's constitutional claim that this provision "amounts to a restriction on *all* advertising by Cablevision" is, in the Court's view, a considerable leap. Plaintiff's Memorandum, p. 18. It seems clear to the Court that the purpose of Section 2.4 is to anticipate contractual contingencies for the protection of the parties. The phrase "cable TV as contemplated by this Agree-

ment" fully captures this spirit. The Court finds that the requirements complained of do not outlaw or curb advertisement as protected commercial speech. Rather, they offer the parties a mechanism by which they may, at their election, submit proposals for the modification of existing contractual terms should unusual circumstances so require. The Court notes the permissive language in the provision: "[i]f Grantee should decide to ...` undertake other income producing activities," which makes the process of modification wholly elective. Since the decision to air advertisements is outside the Agreement, 2.4 does not constitute regulation of commercial speech. At most it could be characterized as a mechanism for mutual regulation of an Agreement which infringes on speech rights to the same extent as it prevents the advent of technological changes in Paragould; that is to say, not at all. In short, this provision is contractual in nature and does not seek, nor have the effect of, regulating speech of any kind.[1] This claim will be dismissed.

■ From this conclusion of law flow others. Since speech is not restricted by Section 2.4, the absence of a similar provision in the City's agreement with LWC could not rise to a violation of the Fourteenth Amendment Equal Protection Clause nor does it "restrict the speech of some elements of society in order to enhance the relative voice of others" as suggested by plaintiff. Plaintiff's Memorandum, p. 18 (quoting *Buckley v. Valeo*, 424 U.S. 1, 48–49, 96 S.Ct. 612, 648–49, 46 L.Ed.2d 659 (1976)). A party contracting to buy widgets from Company A does not violate equal protection when it contracts to buy zidgets from Company B.

■ Finally, plaintiff's complaint alleges that "while [the City] may be willing to acquiesce / to Paragould Cablevision's request to insert local advertisements, it will do so only if the revenues from such advertisements are included in the franchise fees paid" to the city. Complaint, para. 37. Such an inclusion, argues plaintiff, amounts to a selective and discriminatory media tax since LWC is not, even in the abstract, subject to such a "tax." This claim is, as a threshold matter, premature since the issue rises, if at all, in the future, and therefore does not raise a justiciable controversy for Article III purposes. Along with its jurisdictional infirmity this claim is frivolous. Contractual modifications do not automatically become tax questions merely because one party is a political subdivision with taxing authority and, as found above, the provisions of 2.4 do not inhibit speech. This claim will also be dismissed.

## V. THE PENDANT STATE–LAW CLAIMS

Because none of plaintiff's federal claims survive the 12(b)(6) motion to dismiss, federal jurisdiction over the state-law contract claims would, at this stage of this proceeding, be inappropriately maintained by this Court. *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As the Supreme Court recently wrote:

> Under *Gibbs*, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the law suit in its early stages and only state-law claims remain, the federal court should decline to exercise of jurisdictions by dismissing the case without prejudice.

*Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 618–19, 98 L.Ed.2d 720 (1988). Accordingly, the Court will dis-

---

1. The Court notes in passing that cities may place reasonable time, place and manner restrictions on the protected right to engage in commercial speech when the limits serve a significant governmental interest and leave open other channels of communication. *See e.g. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976).

 

miss these claims without prejudice to future suits.

IT IS THEREFORE ORDERED that defendants' Motions to Dismiss be, and they are hereby, GRANTED. Counts I and II, comprising the antitrust and First and Fourteenth Amendment claims, are dismissed with prejudice and Count III, containing the state-law claims, is dismissed without prejudice.